**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON**

**CRIMINAL ACTION NO. 13-40-DLB-JGW**

**UNITED STATES OF AMERICA**                                                         **PLAINTIFF**

vs.         **AMENDED MEMORANDUM OPINION AND ORDER**[1]

**MICHAEL ALBERT WILSON, JR.**                                 **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**I. INTRODUCTION**

This matter is before the Court on Defendant's Motion to Suppress (Doc. # 20) physical evidence seized from his laptop computer and statements he made to the police. After the matter was fully briefed (Docs. # 23 and 24), the Court held an evidentiary hearing on the Motion. The parties were instructed to present evidence relating to the initial seizure of the laptop computer from Evergreen Cemetery; to highlight the facts relevant to Defendant's position that he maintained a reasonable expectation of privacy in the suitcase and laptop despite his homeless status; and to clarify the circumstances surrounding the officers' search of the laptop's contents. Attorney James West appeared on behalf of the Defendant, who was also present. Assistant United States Attorney Jason Denney appeared on behalf of the United States. At the conclusion of the hearing, the Court

---

[1] This Amended Memorandum Opinion & Order (MOO) is identical to the previous one entered on November 20, 2013 with one exception: the minor victim is identified in this MOO by her initials K.B., as opposed to her actual name. The prior MOO is being re-docketed as a sealed MOO.

1

submitted the Motion pending written decision.  For reasons set forth herein, the Court will **deny** Defendant's Motion.

## II. FINDINGS OF FACT

(1) On April 16, 2013, Rena Gearding discovered a plastic-wrapped suitcase while walking her dogs at the edge of a wooded area in Evergreen Cemetery in Southgate, Kentucky.  She unwrapped the suitcase, opened it, and discovered a laptop computer, batteries, change and prescription bottles stored inside.

(2) Gearding turned the suitcase over to Cemetery employee J.D. Bishop, who decided to keep it overnight and give it to his supervisor the following day.

(3) On April 17, 2013, Bishop turned the suitcase over to David Smith, the Superintendent of Evergreen Cemetery.  Smith took the suitcase to the Southgate Police Department, but he was unable to locate a police officer.  He returned to the Cemetery with the suitcase and called the police.

(4) Southgate Police Officer Chad Martin went to Evergreen Cemetery later that day, collected the suitcase from Mr. Smith, and returned to the Southgate police station with it.

(5) Officer Martin looked through the suitcase in hopes of finding contact information for the owner.  He found a Social Security card, birth certificate and passport for Michael Albert Wilson, Jr. in the top outer pocket, but no photo identification.  He did not inventory the suitcase's contents because he did not believe the items had any evidentiary value.

(6)     Officer Martin asked dispatch to run Wilson's name and Social Security number through its database. Although the database did not yield an address for Wilson, it did reveal that he was a registered sex offender.

(7)     Because Officer Martin had not yet found an address, he decided to power up the laptop and continue looking for Wilson's contact information. However, he soon discovered that the laptop was password-protected, so he called Steven Schauer, IT Consultant for the Southgate Police Department, and asked him to come to the police station.

(8)     Schauer arrived at the police station about fifteen to twenty minutes later. Using Linux software, he was able to bypass the password feature and quickly access the laptop's data.

(9)     Police Chief John Christmann and Officer Steve Collingsworth were present as Schauer and Officer Martin browsed the laptop's contents. Officer Martin first directed Schauer to look in the "My Documents" folder for a resume or any other document containing contact information. Finding nothing helpful in that folder, Officer Martin asked Schauer to look in the "My Pictures" folder. When they opened that folder, they saw a list of saved photos with corresponding mid-size icons. They scrolled through this list but did not enlarge any of the photos. However, they could tell from the icons that many of the photos featured the same man, who they assumed to be Wilson. They also saw several photos of nude women, but nothing about these photos suggested that they were contraband. After looking through these two folders for approximately ten to twenty minutes, Officer Martin instructed Schauer to shut the laptop down.

(10)     Officer Martin then contacted Kentucky Probation and Parole about Wilson. The probation officer reported that Wilson was staying at 217 West 13th Street in Newport, Kentucky. The probation officer also emailed Wilson's photo to the Southgate Police Department. Police officers went to the Newport address to tell Wilson that they had his suitcase, but they discovered that he was no longer living there.

(11)     On April 18, 2013, Chief John Christmann was driving along US-27 when he spotted a pedestrian resembling Wilson. Chief Christmann stopped the man, confirmed that he was Wilson, and informed him that the Southgate Police Department had his suitcase. Chief Christmann then asked Wilson where he was staying. Wilson explained that he was staying with his girlfriend K.B. at 120 West Walnut Street in Southgate, Kentucky. After reminding Wilson that he needed to register his new address with Probation and Parole, Chief Christmann continued on his way.

(12)     Officer Martin went to visit Wilson at the Southgate address and discovered that it was also invalid. He notified Wilson's probation officer, who called Wilson to ask him about his address. Wilson admitted lying to Chief Christmann and told the officer that he was staying at the invalid Newport address. When the probation officer relayed this information, Officer Martin called Wilson and informed him that he had provided false information to the sex offender registry. Wilson then admitted that he was homeless and promised to tell his probation officer where his campsite was located. He later reported to Probation and Parole that he was camping under the US-27 underpass in front of St. Therese school.

(13)     Meanwhile, Officer Martin asked dispatch to run a database search on K.B. The search revealed that K.B. was an eighteen year old high school student living in Wilder,

Kentucky. Officer Martin contacted K.B. and asked if she knew Wilson. She replied that she had met Wilson online two years ago and that they had planned for him to come to Kentucky when she turned eighteen. When asked about the nature of this online relationship, K.B. admitted that it was sexual in nature and that she had sent nude photos of herself to Wilson. These photos were taken before K.B. turned eighteen.

(14) Based on his conversation with K.B., Officer Martin applied for a warrant to search all of Wilson's electronic devices, including his laptop computer. Officer Martin then located Wilson at a laundromat near his campsite and arrested him for providing misinformation to the sex offender registry.

(15) After reading Mr. Wilson his *Miranda* rights, Officer Martin asked Wilson, "What would happen if I checked your computer for nude images of K.B. when she was under eighteen?" Wilson replied, "It would be bad if you checked my computer."

(16) At the time of his arrest, Wilson had been living in Kentucky for two and a half (2 ½) weeks. He traveled from Mannasas, Virginia, where he had been staying with his mother, to Cincinnati, Ohio. He then crossed the Purple People Bridge into Kentucky and set up a camp, consisting of a trash bin and a crude open-sided shelter, in the wooded area of Evergreen Cemetery. Wilson tried to camp in a secluded area for safety reasons, and did not tell anyone about his campsite, but he acknowledged that passers by could potentially stumble upon his camp.

(17) Wilson kept his most valuable possessions in his suitcase. He stored his Social Security card, birth certificate, passport and prescription medications in the upper front pocket and secured his electronic drawing tablet in the lower front pocket. The inside of his suitcase housed his laptop computer, which he cushioned using clothing sealed in

5

Ziploc bags.

(18)    Wilson hesitated to leave the suitcase at his campsite for fear that passers by would stumble upon it, but he believed that he would be a target for robbery if he carried it with him around Newport.  He took a small backpack with him when he left the campsite, but his concerns about robbery also prevented him from carrying his valuables with him in the backpack.  When he left the campsite, he would pack the suitcase and wrap it in plastic to protect it from the elements.  He would then hide the suitcase in the woods a short distance away from his main campsite.  The suitcase was in one such hiding place when Rena Gearding spotted it while walking her dogs along her regular route.

## III.    ANALYSIS

### A.    Does the Defendant have a reasonable expectation of privacy in the suitcase found in Evergreen Cemetery?

Defendant argues that Officer Martin's search of his suitcase violated his Fourth Amendment right to be free from unreasonable searches.  The government responds that no Fourth Amendment violation occurred because Defendant did not have a reasonable expectation of privacy in the suitcase.  In support of this assertion, the government points out that Defendant, a homeless man living in Evergreen Cemetery, left the suitcase under a tree where it was later discovered by a woman walking her dogs.

#### 1.    Defendant did not have a reasonable expectation of privacy in the suitcase.

The Fourth Amendment protects people, not places, from unreasonable searches and seizures.  U.S. Const. amend. IV; *Katz v. United States*, 389 U.S. 347, 351 (1967). Anything that a person knowingly exposes to the public, even in his own home or office, is

6

not subject to Fourth Amendment protection, but what that person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351.

In order to evaluate Defendant's claim that Officer Martin violated his Fourth Amendment rights by looking through the suitcase, the Court must first determine whether Defendant has a reasonable expectation of privacy. This threshold inquiry requires the Court to address two sub-issues: (1) whether Defendant manifested a subjective expectation of privacy in the suitcase discovered in Evergreen Cemetery; and (2) whether society is prepared to recognize Defendant's expectation of privacy as reasonable. *California v. Ciraolo*, 476 U.S. 207, 211 (1986). A defendant seeking to claim the protection of the Fourth Amendment bears the burden of proving that he had a reasonable expectation of privacy in the object of the search. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

At the evidentiary hearing, Defendant testified that the suitcase contained his personal effects as well as his electronics, which had both monetary and professional value to him as a budding graphic designer. He did not want to carry a suitcase full of such important possessions around Newport because he feared that he would be robbed. However, he also hesitated to leave the suitcase behind because he knew that a passerby might stumble upon his campsite and he did not want his possessions stolen or otherwise disturbed in his absence. Since Defendant had only been in Kentucky for about two and a half weeks, during which time he was homeless, he had limited options for storing the suitcase in another location or leaving it in another person's care. He ultimately decided that it would be best to hide the suitcase in the woods near his campsite.

Defendant detailed the specific steps he took in securing his suitcase and the items within it.  Before leaving the campsite, Defendant would pack the suitcase, taking care to cushion the electronics with clothing sealed in Ziploc bags, then zip it and wrap it in plastic to protect it from the elements.  He would then hide his suitcase in the woods surrounding his campsite.  Although he hid the suitcase in a slightly different location each time he left the Cemetery, he always took care to hide it in a secluded area close to his campsite. Defendant testified that he did everything he possibly could, short of burying the packed suitcase in the dirt, to secure his belongings.

Defendant's testimony establishes that he wanted to protect his property from theft or other disturbance because it had great personal significance and monetary value. However, Defendant demonstrated more than just a desire to preserve these items.  He did everything that he thought possible and practicable in his homeless state to preserve his privacy.  Based on his efforts and his underlying intent, the Court finds that Defendant manifested a subjective expectation of privacy in the suitcase found in Evergreen Cemetery.  Therefore, the Court must consider whether society is prepared to recognize Defendant's expectation of privacy as reasonable.

No court has considered the narrow issue of whether society is prepared to recognize a homeless man's expectation of privacy in items hidden near his campsite as reasonable. Still, Defendant argues that society does recognize such an expectation based on *United States v. Sandoval*.  In *Sandoval*, the Ninth Circuit held that a warrantless search of a four-sided unoccupied tent located on Bureau of Land Management property infringed upon a reasonable expectation of privacy.  200 F.3d 659, 660 (9th Cir. 2000).  Although Defendant does not explain how *Sandoval* relates to the facts of this case, the Court

presumes that Defendant cites this case for the proposition that a person can have a reasonable expectation of privacy in an outdoor shelter, such as Defendant's campsite.

The United States maintains that *Sandoval* is inapposite because the Ninth Circuit based its decision on the fact that law enforcement agents could not see inside the tent, which was enclosed and pitched in a secluded area, before they searched it. *Id.* By contrast, Defendant's campsite was a rudimentary open-sided shelter and his suitcase was placed under a nearby tree where it was easily visible from a public path. According to the United States, society may be willing to recognize a person's expectation of privacy in an enclosed tent as reasonable, but it is not willing to recognize such an expectation in an open shelter or a suitcase semi-hidden under a tree.

The United States also points to a line of Sixth Circuit case law holding that a defendant did not have a reasonable expectation of privacy in a sporadically inhabited vacant house. *See United States v. Hunyady*, 409 F.3d 297, 301-03 (6th Cir. 2005)(holding that defendant did not have a legitimate expectation of privacy in deceased father's house where he occasionally stayed); *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998)(holding that defendant did not have a reasonable expectation of privacy in vacant home he inhabited for a week). Since the Sixth Circuit has declined to recognize that transients have a reasonable expectation of privacy in houses used as temporary shelters, the United States argues that Defendant, as a homeless person, cannot have a reasonable expectation of privacy in a rudimentary open shelter and the surrounding wooded area.

Because both lines of case law cited by the parties have distinguishing facts from those present here, the Court cannot rely on either as dispositive. Instead, the Court must base its decision on the unique factual circumstances surrounding this case. While the

Court recognizes that Defendant did everything that he thought practicable to protect his property, the Court also believes that it would have been feasible to do more. Specifically, the Court notes Defendant's failure to lock the suitcase. Although Defendant acknowledged that he could have locked the suitcase, he chose not to because he felt that a lock would not deter someone who was determined to get into his leather suitcase.

The circumstances under which the suitcase was found also do not support a conclusion that society would be prepared to recognize his expectation of privacy as reasonable. Defendant testified that he hid the suitcase under a tree near his main campsite, but the suitcase was easily spotted and removed from its hiding place by Rena Gearding. In fact, Gearding's affidavit indicates that she was walking her dogs along one of her usual routes when she spotted the suitcase resting under a tree about ten feet into the woods. However, Defendant's own testimony that he half-expected someone to come upon his campsite and find the suitcase nearby is most compelling. These facts, taken together, persuade the Court that society would not recognize Defendant's expectation of privacy in the suitcase as reasonable. Since this prong of the analysis is not satisfied, the Court concludes that Defendant does not have a reasonable expectation of privacy in the suitcase, and therefore no Fourth Amendment violation occurred when Officer Martin looked through it.

> **2. Even if the Defendant had a reasonable expectation of privacy in the suitcase, his Fourth Amendment rights were not violated because police officers may look through found personal property for the purpose of identifying an owner.**

Although the Sixth Circuit has not specifically addressed whether an officer may look into found items for the purpose of identifying an owner, doing so is reasonable under the

circumstances here.  In fact, case law from other courts suggests that a limited search would not run afoul of the Fourth Amendment.  When containers have been turned over to the police, an officer "may validly search lost property to the extent necessary for identification purposes."  *State v. Ching*, 678 P.2d 1088, 1093 (1984).  An officer's "paramount goal must be to ascertain its ownership and return it to the owner in substantially the same condition as it was received." *Id.*  He may also conduct a search of lost property to safeguard the property, protect the police department from false claims, and protect the police from danger.  *Id.*  A search of an item separated from its owner should be the least intrusive means necessary to identify the owner and secure the property.  *State v. Hamilton*, 314 Mont. 507, 520 (2003).

In this case, a private citizen spotted Defendant's suitcase in the wooded area of Evergreen Cemetery, retrieved it from its resting place, and opened it.  Once she realized that it contained valuable electronics, she and Cemetery employees took steps to turn it over to the police.  Although the suitcase may not have been lost in the traditional sense because Defendant intended to retrieve it when he returned to his campsite, it had clearly been separated from its owner at this juncture.  Therefore, it was permissible for Officer Martin to look through the suitcase's contents in an effort to find identifying information, such as a driver's license, with which he could locate the owner.  Although the primary purpose of the search was to identify the owner, it also served the permissible secondary purpose of protecting police officers from false claims.  If Officer Martin had not searched the suitcase, the police department would have had no choice but to either hold on to the suitcase indefinitely or dispose of it.  These alternatives could have adverse consequences for the police department if the owner was later discovered.  Although Officer Martin

searched all of the suitcase's compartments, he did not take inventory of its contents, which supports his assertion that he did not believe these items had any evidentiary value.

Even if Officer Martin's initial effort to find contact information for the owner was permissible, Defendant maintains that the search of the suitcase should have ceased after Officer Martin discovered Defendant's Social Security card and prescription medications in the outer front pocket. While these items may have provided sufficient information to identify to Defendant as the probable owner of the suitcase, they had limited utility in actually contacting or locating him. Social Security cards typically contain a name and Social Security number, but no address or phone number. Medication labels do provide contact information, but Defendant had filled these prescriptions in Mannasas, Virginia. Therefore, the contact information printed on these medication labels would not be very helpful in locating an owner. Since Officer Martin's search of the outer pocket only yielded a name, Social Security number and out-of-state address, the Court concludes that it was reasonable for Officer Martin to continue his brief search through the suitcase's contents in an effort to find valid contact information for its owner.

**B.     Does the Defendant have a reasonable expectation of privacy in the laptop computer stored inside the suitcase?**

Defendant also argues that Officer Martin violated his Fourth Amendment rights by searching his laptop computer. Defendant maintains that he had a constitutionally protected reasonable expectation of privacy in the laptop computer because it was password-protected. The government simply responds that no Fourth Amendment violation occurred because he did not have a reasonable expectation of privacy in the laptop.

12

**1. Although Defendant did have a reasonable expectation of privacy in the laptop computer, his Fourth Amendment rights were not violated because police officers may look through found property to identify an owner.**

During the evidentiary hearing, Defendant testified that he had stored personal data on the laptop computer. He did not want that information to be readily available to anyone who powered up his laptop, so he placed a password on the laptop to prevent others from browsing its contents. Although he used a standard password protection feature that is installed on all personal computers, he did not use a password that could be easily guessed or clearly associated with him. Based on Defendant's stated intent to prevent others from accessing the laptop and his belief that basic password-protection was sufficient to accomplish this goal, the Court finds that Defendant manifested a subjective expectation of privacy in his laptop computer. The Court must now address whether society is prepared to recognize that expectation as reasonable.

In view of constantly evolving technology, courts, including those within the Sixth Circuit, are increasingly willing to find that society recognizes a privacy expectation with regard to personal computers as reasonable. *See, e.g., Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) (holding that computer users generally have a reasonable expectation of privacy in data stored on a home computer). When assessing whether a person has a reasonable expectation of privacy in a computer, the Sixth Circuit usually considers password protection as a factor in the analysis. *United States v. Lucas,* 640 F.3d 168, 177 (6th Cir. 2011); *United States v. Aaron,* 33 F. App'x 180, 184 (6th Cir. 2002) (stating that, when assessing the scope of a privacy interest, the court should examine "whether the relevant files were password-protected or whether defendant otherwise manifested an

13

intention to restrict third party access").

Defendant argues that society would generally interpret password-protection as a kind of "Keep Out" sign, and therefore would recognize a person's expectation of privacy in a password-protected laptop as reasonable. The testimony of Southgate Police Department's IT Contractor, Thomas Schauer, supports Defendant's assertion. When asked whether he thought members of society would recognize an expectation of privacy in a password protected laptop as reasonable, he replied in the affirmative. Since Schauer consults regularly with individuals and small businesses about technology, he understands how members of the general public interact with technology on a daily basis and is in a better position than most lay witnesses to answer this question.

The government tries to draw a distinction between the basic password protection feature that comes standard on all laptops and more sophisticated password protection measures. Since Schauer was able to quickly bypass the password protection feature on Defendant's laptop, the government maintains that Defendant had no reasonable expectation of privacy in the laptop. However, the Sixth Circuit has never indicated that the level of password protection used would impact the analysis. Defendant sought to keep the data on his laptop private using basic password protection. In an era where personal electronics proliferate and are often sold with a password-protection option, society is likely to recognize Defendant's subjective expectation of privacy as reasonable. The situation here is no different that the basic four digit pass code that one must use to access an iPhone. Just because the iPhone could be reset at an Apple store to the default settings doesn't mean that the iPhone's owner doesn't have a reasonable expectation of privacy in the iPhone when he restricted access to it by setting a four digit entry code. For all of these

reasons, the Court concludes that Defendant does have a constitutionally protected reasonable expectation of privacy in his laptop computer.

This conclusion notwithstanding, Officer Martin's limited search of the laptop was constitutionally permissible in an effort to identify its owner. As discussed in Part A, a police officer may conduct a search of found property to the extent necessary to identify an owner. When Officer Martin decided to power up Defendant's laptop, he had already discovered Defendant's Social Security card and prescription bottles. However, these items did not yield any contact information for the owner. Officer Martin browsed the laptop's contents for the limited purpose of finding current contact information, which was not only permissible according to the above-cited case law, but reasonable under these specific circumstances. If no owner was found, the police department would have to either hold on to the property indefinitely or dispose of it.

The manner in which Officer Martin searched the laptop's contents is consistent with his stated purpose. He directed Schauer to open the "My Documents" section first, hoping to find a resume or some other document with an address on it. When that yielded no helpful information, they went to the "My Pictures" section, trying to find clues to an address or license plate number. Although both Officer Martin and Schauer testified that they saw photos of naked women, neither saw anything that suggested contraband. The fact that they simply scrolled through the photo icons, rather than enlarging them and scrutinizing their content, is consistent with their testimony that they did not believe the photos were unusual or inappropriate. After ten to twenty minutes of looking through the laptop, Officer Martin directed Schauer to shut the laptop down. Considering the limited purpose and manner of Officer Martin's search of the laptop, the Court concludes that he did not violate

Defendant's Fourth Amendment rights.

> **2. Even if the initial police search of the laptop violated the Defendant's Fourth Amendment rights, evidence obtained in the subsequent search of the laptop is admissible under the independent source doctrine.**

Evidence obtained in violation of the Fourth Amendment is ordinarily subject to exclusion. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961). This exclusionary prohibition extends to indirect as well as direct products of such invasions. *Wong Sun v. United States*, 371 U.S. 471, 490 (1963). In determining whether exclusion is appropriate for evidence that is "fruit of the poisonous tree," the key inquiry is "whether, granting establishment of primary illegality, evidence to which instant objection is made has been come at by exploitation of illegality or instead by means sufficiently distinguished to be purged of primary taint." *Id.* at 488. For example, evidence that has been discovered by means wholly independent of any constitutional violation may be admitted. *Nix v. Williams*, 467 U.S. 431, 432 (1984). This "independent source doctrine" rests on the rationale that "society's interest in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id.*

Defendant argues that, after Officer Martin violated his Fourth Amendment rights by searching his laptop computer, Officer Martin used nude photos found during that initial search to obtain a search warrant for a subsequent laptop search and elicit statements from Defendant at the time of his arrest. Defendant believes that the photos found during the second laptop search, as well as the statements Defendant made to Officer Martin, are fruit of the poisonous tree and should be excluded. The government responds that, even

if Defendant's Fourth Amendment rights were violated by the initial search, nothing viewed during the initial search was incorporated into the search warrant or the underlying affidavit that authorized the second search. Accordingly, the government maintains that the photos and statements are admissible under the independent source doctrine. To address Defendant's argument, the Court must retrace Officer Martin's steps to determine whether the photos and statements were obtained by means wholly independent of any alleged constitutional violation.

During Officer Martin's search of the suitcase, he found Defendant's Social Security card and asked dispatch to run a database search on the listed name and number. When the database search revealed that Defendant was a registered sex offender, Officer Martin reasonably decided to contact Kentucky Probation and Parole. Since the suitcase search had not yielded any useful contact information, Officer Martin no doubt hoped that Defendant had reported his current address to Probation and Parole. The probation officer gave Officer Martin the Newport address Defendant had provided and emailed Defendant's photo to Southgate police. However, when officers went to the Newport address to tell Defendant about his suitcase, they learned that he no longer lived there.

Later that day, Chief Christmann was driving along US-27 when he happened to spot a pedestrian resembling Defendant's photo. Chief Christmann stopped Defendant to tell him that Southgate police had his suitcase and ask him where he was staying. Defendant told Chief Christmann that he was staying with his girlfriend, K.B., in Southgate. Having heard about the officers' visit to the invalid Newport address, Chief Christmann reminded Defendant to update his address with Probation and Parole and then proceeded on his way.

Officer Martin thereafter decided to check the Southgate address where Defendant said he was staying with K.B.. He discovered that it was also invalid, so he notified Defendant's probation officer. When the probation officer called Defendant to ask about his address, Defendant admitted lying to Chief Christmann and stated that he was staying at the Newport address. This information was relayed to Officer Martin, who already knew that the Newport address was invalid. Officer Martin called Defendant and informed him that he had provided false information to the sex offender registry. Defendant admitted that he was homeless and promised to tell Probation and Parole where he set up camp.

Meanwhile, Officer Martin decided to follow up on the information Defendant gave Chief Christmann. He asked dispatch to run a database search on K.B. This search revealed that K.B. was a high school student in Wilder, Kentucky, who had just recently turned eighteen. Officer Martin contacted K.B. to ask whether she knew Defendant. She replied that she had met Defendant on the Internet when she was sixteen years old. The two had planned for him to come to Kentucky once she turned eighteen. Officer Martin then asked her whether the relationship was sexual in nature and whether nude photos were exchanged. She stated that it was a sexual relationship and that she had sent him nude photos of herself before she turned eighteen.

Although Defendant has not been particularly clear on this point, the crux of his argument seems to be that Officer Martin only asked K.B. about the nature of the relationship and the existence of photos because he had already seen nude photos on Defendant's laptop during the initial search. However, Officer Martin repeatedly stated that nothing about the photos immediately suggested contraband. He was simply trying to return Defendant's property when he discovered that Probation and Parole did not have

18

Defendant's current contact information. Defendant led Officer Martin to K.B. by repeatedly providing misinformation, if not outright lying, to law enforcement. Because K.B. met Defendant online as a teenager and corresponded with him for an extended period of time, it was reasonable for Officer Martin to explore the possibility that an inappropriate relationship existed. When she admitted that the relationship was sexual and that photos had been exchanged while she was still underage, Officer Martin had the probable cause he needed to apply for a search warrant.

After tracing Officer Martin's steps, which were detailed in the affidavit underlying the search warrant, the Court finds that there is a constitutionally sound chain of events, beginning with Officer Martin's discovery of Defendant's Social Security card during the permissible suitcase search and ending with the second laptop search pursuant to the search warrant, that led to the discovery of the contraband photographic evidence. Even if Officer Martin's initial warrantless search of the laptop violated Defendant's Fourth Amendment rights, there is nothing to indicate that Officer Martin relied on information or observations from the initial warrantless search in conducting his subsequent investigation. Defendant's lies to law enforcement, not the photos on the laptop, led Officer Martin to contact K.B. Her description of her atypical relationship with Defendant would make any reasonable police officer inquire further to ensure that no child exploitation had occurred, and Officer Martin did just that. His affidavit relies chiefly on this interview with K.B. and makes no reference to the nude photos found on Defendant's laptop during the initial search. Therefore, the photos obtained from the second search of Defendant's laptop are admissible under the independent source doctrine.

### 3. Defendant's statements are admissible.

Defendant's lies to law enforcement also gave Officer Martin probable cause to arrest Defendant for providing false information to the sex offender registry. Officer Martin properly Mirandized Defendant before asking him if naked pictures of K.B. would be found during a search of his laptop. Defendant responded "It would be bad if you looked on my laptop." Officer Martin did not ask this question because he had already seen naked photos on Defendant's laptop, but because K.B. had admitted to sending Defendant nude pictures of herself while she was underage. Therefore, Defendant's statement is also admissible under the independent source doctrine.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1) Defendant's Motion to Suppress (Doc. # 20) is hereby **DENIED**; and

(2) The time period between August 30, 2013 and November 20, 2013, the date of the original Memorandum Opinion and Order, totaling eighty-two (82) days, is excluded from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. §§ 3161(h)(1)(D)&(H).

This 20th day of November, 2013.



Signed By:
*David L. Bunning* DB
United States District Judge

G:\DATA\Opinions\Covington\2013\13-40 Amended MOO denying MTS - DE 20.wpd